The next case is SightSound Technologies v. Apple, Inc., 2015-1159. Mr. Wolfe. Thank you, Your Honor. May it please the Court, Matthew Wolfe, for SightSound. Apple brought eight grounds in its petition. At the end of the day, all eight grounds were rejected. Yet we stand before you today with invalid claims based on a final written decision that is rife with both substantive and procedural errors, and those errors are entirely interrelated. Recognizing I should probably tread somewhat gingerly in quoting Versada, Versada told us that a final written decision can be reviewed for compliance with a limit on whether a issue not raised by the party can be considered by the Board. It has to do, it does support you on whether you can appeal the question of whether it's a covered business method patent, but it does not support you on the issue of whether the Board went beyond the assertions made by the requester. Respectfully, Your Honor, 35 U.S.C. 322 and 37 CFR 42-208 circumscribe the Board's invalidation authority in the CBM context. And Versada tells this Court that it can review issues that go to the ultimate invalidation authority. But that argument proves a little bit too much, doesn't it? Because any kind of limitation on the Board's authority to initiate is also in some ways a limitation to authority to invalidate. So that can't be what Versada meant. Your Honor, we have – Let me ask you this. Yes. Are you familiar – I know it came out after the briefing here, but with our recent Acadia decision. I am, Your Honor. Why doesn't that place Versada properly in context here and recognize that the CBM requirement is a special requirement that can be reviewed at the later stage? Because it goes overall to whether there's a whole class of patents that the Board can review or not. But once it gets into the specific case-by-case decisions on whether it meets certain requirements, those specific case-by-case decisions are not reviewable. Understood, Your Honor. And I read Acadia at least implicitly to talk about a continuum of decisions that the PTAB can make. On one hand, we have things that are procedural, that go to, in that case, a time limit, that are within its ordinary course. But here we have a statutory regime. And let me just start with a specific example that I think is unique to this case, which is the estoppel provision of the CBM. The estoppel provision of the CBM statute requires a petition for CBM or precludes further litigation for an act, a ground that has been brought. Not that could have been brought. Has been brought. If what the PTAB did in this case is allowed, it makes a hash out of that provision. Because now if a party says, oh, the name of a prior art reference, well, that — well, does that mean that if they only talked about section 102, that any discussion of 103 or 112 or 101 based on that or an analogous reference is now off the table? You can actually imagine the plaintiff coming — the reverse situation where someone said, hey, I didn't raise this. Why is it being held against me in a district court? I was only arguing 102, not 103. The board sua sponte raised 103. I never suggested it. Why am I estopped? Well — Mr. Walker, you might move back a little bit. Oh, I'm sorry. You're all moving? Lower your tone. I apologize, Your Honor. I've been told to be quiet more than once. The — the estoppel regime is part of the entirety of the regime. We start with 322a3 that says that the petition has to identify in particularity each claim challenged, the grounds, and the information. But you're trying to set up this distinction between procedural and merits things, I think. But if that's the case, why weren't the kind of requirements at issue in Quozo also on the merits side, the way you're portraying them? Because no significant due process concerns are implicated by someone being a year or a year and a day late. There are significant due — That's not what Quozo was about. Understood, Your Honor. But he was talking about Acades. I understood the question. No, he asked about Quozo. In Quozo, first of all, Quozo does not have the same estoppel implications because there's a different estoppel regime with IPRs than there are with CBMs. And so that is a very significant difference between Quozo and the facts at issue here. Secondly, it is unambiguous under 37c of 442208 that the only discretion the PTEP has is to — is to rule on, to decide on issues raised in the petition. If an issue is not raised in the petition, they have no authority. They have no legal authority to talk about it. I see very little difference between that scenario and the Quozo scenario where the statute said you can only initiate review based upon the art cited. And the Court said even though the art wasn't cited, the Court could still go ahead. Your Honor, if we — well, first of all, we have to talk about Quozo in light of Versada. And Versada specifically talks about — Well, if you're reading — — ultimate invalidation. If you're reading a distinction between — or a conflict between Quozo and Versada, then Quozo governs, does it not? Except, well, Quozo — Versada specifically says there's no — that there's no conflict. It says that Quozo didn't raise the issue. Right. And Katie's very — made that very clear by saying the whole point of it is all these procedural limitations on the Board's initiation fall in the no-review camp, and it's only the special CBM requirement which refers to a whole class of patents that is reviewable after initiation. And, Your Honor, we can start with the 324e question and what is and is not reviewable. And obviously there's a lot of collateral activity on Quozo and Versada that may or may not affect what we're talking about in the coming months. But in this particular case, there can be no dispute that 322 says that the Petitioner must list with particularity. And then, very importantly, Your Honors, in Epicor, the PTAB itself defined what of the 322a3 standard. It told us what you had to do to raise obviousness sufficiently for it to be considered in terms of identifying which prior art, motivation to combine, et cetera. Here we know that standard was met because the words 103 and compusonics were never mentioned in the same section of the opinion. So the very standard the PTAB laid out for — for — for meeting 322, it refused to apply to itself. It said we can raise this sua sponte after the fact. In fact, Your Honors — Did you get an opportunity to respond? No, because the final written decision came up with a ground for a combination that was never raised by Apple, never articulated by any of the experts in this case. Essentially — and why don't we skip to — I thought they raised — I thought the Board advised you about that issue in the decision to initiate. No, Your Honor, not the — so what the Board found in its final written decision was it would have been obvious for one — now, again, there are all kinds of problems with the final written decision in not identifying which references are to be combined, but put that aside for the moment. What it said in its final written decision was it would have been obvious for someone to take a hard drive and swap it out for the removable media that was in the prior art. It did that based on no expert. In this case, no expert explains why it would have been obvious to use a hard drive to store music purchased over the Internet. It just — that evidence just doesn't exist in this record. The Board just said, well, we think it was obvious. We think it could have been swapped out. No, the prior art reference itself spoke about using a hard drive to store under certain circumstances. Not in the context of the claim, though. As Your Honor well knows, when you're talking about combination, and KSR tells us, the question is not is it obvious to look at any individual piece, any particular limitation of a claim. The question is the claim as a whole in its context. And, you know, most of the people in this room can't remember a time when you couldn't download music onto a hard drive over the Internet. But Mr. Hare in the mid-'80s thought of it. It's so now ubiquitous that the PTAB said we on our own are going to supply evidence that this would have been obvious. Even Apple's experts wouldn't go that far. Their experts wouldn't say in light of the market paradigms, in light of the pressures, in light of the biases in the technology, in the industry, it would have been obvious to take a hard drive and use that instead of CDs or cassettes. There's no record evidence of that, and that didn't come out until the final written decision. So even if our surreply, which, of course, is a terribly thin reed to try to wash something clean with to mix my metaphors horribly, even if that were sufficient, you can't surreply to something that comes after the fact. So let's turn now to the other problem with the obvious misdetermination, which is secondary considerations. And particularly in a case like this where the patented issue is, and let me be clear, it is revolutionary. Mr. Hare invented iTunes a decade before it hit the market. He sold the first song over the Internet. They sold the first movie over the Internet. This is not a troll. This is not someone that bought a patent and thought after the record, we'll try to figure out some way to apply it. Didn't the Board find evidence that iTunes arose from a lot of other sources? They did it based on a declaration of a witness who admitted he hadn't even looked at the claims of the patent. This is Mr. Robin. He hadn't even looked at the claims of the patents he was listing, let alone whether they had any of the ---- Because he didn't look at the claims his declaration gets thrown in the trash? We're talking about a substantial evidence standard here. I mean, just to give you an example, Your Honor, they cited the Board, PTAB cited the genius feature as one of the reasons iTunes was successful. The genius feature came out five years after iTunes was released. How about music licensing? That was something that was in iTunes from the beginning, right? And, Your Honor, that only supports our position. The reason Sitesound did not succeed is because at the time, Sitesound was affiliated with Microsoft, which had 90 percent of the computer market. The record companies did not want to license to someone that might actually kick them out of Tower Records and the Virgin Megastore. So they licensed to this tiny little company called Apple that everybody thought was going to fail to get the antitrust regulators off their back. The case law we cite in our brief makes clear that the limitation on access to raw materials, which is just what this is, that that doesn't indicate no commercial success. To the contrary, Apple got the license. They were successful with our invention. That is a secondary consideration that should have been considered. And it's particularly troubling that the Board reached the decision it could when it said, we haven't proven secondary considerations after they denied us the very discovery we sought. We sought discovery from Apple saying, tell us why iTunes was successful. And Apple said, we're not going to give it to you. And the Board said, that's fine. You don't have to give it to them. And then the Board said, oh, by the way, we're going to find no secondary considerations because you haven't proven why Apple's iTunes was successful. Mr. Wolf, you wanted to make a comment? Yes, please. Yes, Your Honor. Thank you. We'll save it for you. Thank you. Mr. Hickman. Thank you, Your Honor. May it please the Court. On behalf of the PTO, I will address two procedural issues this afternoon before turning it over to Apple to address the Board's patentability decision. Why isn't resting the patentability decision on a ground that wasn't raised at all, an ultravirus act? Your Honor, the reason is, first of all, I would argue that even though the petition itself did not use the word obviousness or didn't cite the statutory section 103, it did on its face support a potential unpatentability ground of obviousness. That's sort of weak language, support and potential. I would disagree, Your Honor, and the reason is because the... Let me ask that question again because you're, I mean, not intentionally, but that you're not answering it the way I intended it to be posed. Let's assume that the petition didn't raise it at all. Let's not get into the facts. If the petition, we find, didn't raise it at all, why isn't the Board's consideration of different grounds fit in with the line of ultravirus cases? If the petition itself in no way raises a certain ground of unpatentability, I would agree that that's probably a line where we would draw between where the Board could institute and where it couldn't. I would agree that there must be some sort of basis in the facts of the petition and the evidence that's submitted with the petition for the Board to be able to determine that it's more likely than not that a certain ground of unpatentability can go forward to trial. And here, Apple's petition clearly did that. It's clearly on the side of supporting the ground of obviousness. Apple submitted about 15 pieces of prior art. If I'm hearing you right, some of these limitations in the statute, if they violate them, are revealable. Some of them aren't. And we held one enclosure wasn't. We held one in Versailles was. We held another one in Acades wasn't. Do you have any reason, distinction, for where we should draw that line? I'm sorry, Your Honor. I just didn't hear the question. Well, I'm trying to figure out, because you seem to be conceding that there's something more than just the CBM determination that can be revealable on final appeal. But I have no understanding where whatsoever we're going to draw that line. When in Cloza, we found one section wasn't reviewable. In Versailles, we found the CBM was. In Acades, we found the time limit wasn't reviewable. I mean, are we just going to have to go one by one through these cases and decide, well, that one looks close enough. We'll review it. This one doesn't look close enough. We won't. Well, I would agree with Your Honor that if. Why isn't the distinction that if you could have framed the petition to cover this, and you could have done it in a timely way, that under those circumstances, those kinds of errors aren't reviewable in a final judgment? I would agree with that, and Cloza sets forth the proper petition standard. Versailles does not question the proper petition standard. And here, there's no doubt that. That's because in Versailles, no matter what they would have done, if it's not a CBM patent, it's not a CBM patent. So you can't fix it. That is what Versailles held. That's correct. And so if Versailles. And you can't distinguish on that ground on whether it's a CBM patent. You can't distinguish Versailles from this case. Would that be correct? On the facts or. . . No, I don't want to confuse you. I'm talking just about the question of whether this is a CBM patent, the second ground. There's no distinction between this case and Versailles on that ground as opposed to the other ground we were talking about. I would agree. It's to the first ground as to whether the patent is a CBM patent. If Versailles stands, Versailles would control. But I would also agree that it can be cabined specifically to whether a patent is a CBM patent. Okay. Now, as to whether a patent is a CBM patent, you argue in your brief for Chevron deference, correct? That is correct. And I'm not sure what the other side's position about that is. Well, even Versada recognized that the determination as to whether a patent is a CBM patent is part and parcel of the PTO's mission. And Versada was very clear that the PTO is entitled to deference in its expertise and how it determines its mission. And so Versada clearly recognized that the Board should be entitled to deference on that issue. I would also note that the agency decided to resolve individual CBM determinations through adjudication as opposed to rulemaking. ProxyCon says that the agency is entitled to do that. And so if Versada stands, the agency needs to be given the latitude to be able to make these determinations on a case-by-case basis. Thank you, Mr. Hickman. Mr. Holwood-Driemeier? Thank you, Your Honor. Unless there are further questions about the procedural issues that Mr. Hickman dealt with, I'll proceed to the merits. Because it is crystal clear that the Board's determination that the patent claims at issue here had no inventive aspect to them over the disclosures of the CompuSonic's publications. That is supported by ample evidence in the record. And it started with the petition and the declaration of Mr. Kelly, his extensive discussion of the way in which these publications related to one another, and his very detailed claim chart that laid out, in fact, all of the grounds ultimately relied on by the Board to conclude that these patent claims were obvious. At the very basic level, the CompuSonic's disclosures disclosed, and this is in Exhibit 41-18, I'm sorry, 41-19, the CompuSonic's system that was a, I'm sorry, it's 41-12, is the, on page four of the red brief, which is the diagram that reflects the system of two computers with memory communicating with each other over the telephone lines with audio or video being transmitted between one or the other. The CompuSonic's telerecording process is disclosed. Then further publications such as Exhibit 41-19 disclose that one could use that process to charge a second party money who would pay by credit card in order to download a symphony into their CompuSonic's processor in their home. And then we further know from the Schwartz patent given by the inventor of the CompuSonic's process that different types of memories, whether they floppy magnetic discs or rigid magnetic discs, are interchangeable. All aspects of the claimed invention here are disclosed. Does the CompuSonic's prior art make the commercial success of iTunes irrelevant? The CompuSonic's, the commercial success goes to whether the claimed invention is original. And we think that the CompuSonic's prior art discloses that it was not innovative. And therefore, it would not, one wouldn't have to go to the statute. Was it anticipated? Yes. You know, we agree. We think that it, that actually. Secondary considerations are irrelevant. That's right. We actually, we argued that this was anticipation, and we believe that that supported, just as I disclosed, that the CompuSonic's telerecording process, the publications showed that that method could be done in a way that involved a payment of money through use of a credit card, that it could be, the audio or video signal could be sent from a memory in one to the memory of a second, and that the memory of the second could include a hard disk. Now, that hard disk is not required by all the claims, but it is by two of the claims, and that too is revealed. So we think it's anticipation. We don't think one needs to show, even deal with secondary considerations. But at the very least, as the Board recognized, even if one concludes that it's not a single process, but multiple varieties of the process, because they are all interrelated, they all relate to the same companies, products and components, they all refer to one another, that that would be obvious. And Judge Dyke, you referenced how the prior art can itself suggest the motivation to combine. And that's what the Board found here. For example, in Exhibit 41-19, where the article, this is a Fortune article, that references the fact that Compusonics had been able to record an hour's worth of audio onto a hard disk, but only about three minutes of audio onto a floppy disk. And the Board said that itself would have suggested to a person of ordinary skill in the art to use a hard disk, if necessary, to achieve the desired recording capacity. So all of that is fully supported by the evidence before the Board. This is not new. It was in the petition that Apple filed. It was laid out in detail in the Kelly Declaration, including in his claim charts. And so the argument that there was some surprise to Sitesound lacks any basis. And as there was reference earlier, even to the — the Board was very, very sensitive to this concern that Sitesound was arguing that it had not had an opportunity to respond. So the Board gave them, sur rebuttal time at argument, gave them an opportunity to file a sur reply, not just a sur reply brief, but also a further declaration if they so chose. Sitesound chose not to file a further declaration. Instead, they simply rehashed the arguments that they had already made before in their briefs. That was their choice, but they cannot now claim to this Court that they were prejudiced in any fashion. If there are no further questions. Thank you, Your Honor. Thank you, Mr. Baldwin-Briemeier. Mr. Wolf has a little less than four minutes. Thank you, Your Honor. Let me start with the procedural issues. Your Honor, you referenced the Quozo wash-clean, the Heinecker question. That may be a useful standard in the IPR context, but we know that standard cannot apply. It cannot be used in the CBM context because of 18a1, the estoppel provision. You cannot ask what could have been raised because that's not the standard. The standard is, and this is throughout the legislative regime and the regulatory regime, what was actually raised. And if you get into what could have been raised, well, then — Why do those two things have to be tied? I mean, when we're looking at whether something is ultra-virus or not, does it matter whether you might not be estopped on those grounds, even if the Board has the power to raise them? I would agree with you completely, Your Honor. We don't — respectfully, we don't agree with the wash-clean doctrine. I was just saying that that can't apply here. The first question is, what does the statute say, what do the regulations say, that the PTAB can and cannot do? The regulation — I'm not sure that I was very clear. What I meant was that even if the Board can go beyond things not presented in the petition without having an ultra-virus problem, why would that necessarily change the estoppel standard? Because the question then becomes, what is — what does estoppel — if the Board is allowed to go beyond — But the estoppel provision applies to you, not to the Board. And so it applies to what grounds you raise, not to what the Board ultimately initiates on. So imagine this hypothetical, and I want to get to the substance here. Imagine a hypothetical where the Board said, we win on everything. And then we — they — Apple turns to the district court and says, well, we want to argue obviousness. And we say, wait, the Board addressed obviousness. And their response is, no, we didn't raise it in our petition. That was all a waste of time. The Board was ultra-virus. The Board shouldn't have done that. Well, now where are we? So the — the point is, the regime in its entirety says the Board is to be limited to what was raised. Every provision says that they can only address what was raised or a subset thereof. And that the only thing that's estoppel is what was raised. As to Your Honor's question about Chevron, simply put, given that the PTAB in this case or the PTO in this case decided to adopt the statutory language verbatim, there is no deference due. The — No, no. Adjudicatory decisions by agencies are also entitled to Chevron deference. It doesn't have to be in a rule. But there's no adjudicatory decision — It's where they're married. At the — at the regulatory level, which is where deference is, an individual administrative body is not entitled — like an ALJ, for example, is not entitled to administrative deference. The agency itself is. Here the agency itself has not promulgated any rules or regulations on that fact. Turning to the substance, three points very briefly. First of all, there was a complete disregard by the PTAB for Demico. There was evidence by their own expert, Mr. Kelly and Mr. Kenswell, that there was — in fact, it took up the whole field, that there was coextensivity between the claims and iTunes. That was completely ignored by the panel. Second, we heard talk about anticipation. Of course, the PTAB rejected the anticipation claim. And finally, I would ask you to — we were asked why we didn't put a declaration in the SIR reply. Well, the reason is simple. Because at that time, the only party that had put in any evidence as to whether a hard drive would have been obvious in that context was Sitesound. Apple has not to this day offered any evidence that a hard drive in the context of these claims would have been obvious. It is simply the ipsedixit of a PTAB engaging in its own fact-finding after the proceedings were closed. That is not the way the regime was set up. That is not fair. That is not right. That is not compliant with statute or regulation. Thank you. Thank you, Mr. Wolff. We'll take the case under advisement.